Filed 12/27/23  P. v. Howard CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E080834 |
| v. | (Super.Ct.No. BAF2200388) |
| RAHEEM QUADREE HOWARD, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Stephen J. Gallon, Judge. Affirmed.

Kendall Dawson Wasley, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

1

I.

INTRODUCTION

Defendant and appellant Raheem Quadree Howard repeatedly stabbed his ex-girlfriend/the mother of his three children with a pocketknife. A jury found defendant guilty of attempted voluntary manslaughter (Pen. Code,[1] §§ 664/192, subd. (a)), the lesser included offense of attempted premediated murder (§ 664/187, subd. (a)) as alleged in count 1; assault with a deadly weapon (§ 245, subd. (a)(1); count 2); inflicting corporal injury on a fellow parent or girlfriend/spouse (§ 273.5, subd. (a); count 3); and violating a restraining order (§ 273.6; count 6). The jury found true the enhancement allegations that defendant used a deadly weapon (§ 12022, subd. (b)(1)) in the commission of counts 1 and 3, and that defendant personally inflicted great bodily injury (§ 12022.7, subd. (e)) in the commission of counts 1, 2, and 3. The jury found defendant not guilty of making criminal threats (§ 422; count 4) and false imprisonment (§ 236; count 5)).

The trial court found true the aggravating factors that the offenses involved great violence or other acts disclosing a high degree of cruelty, viciousness, or callousness and that defendant was armed with and used a weapon during the commission of the offenses. After the court dismissed the prior allegations alleged against defendant, the court sentenced defendant to a total term of 10 years six months in state prison with 266 days' credit for time served as follows: the upper term of five years six months on count 1, plus a consecutive term of five years for the great bodily injury enhancement; the

---

[1] All future statutory references are to the Penal Code unless otherwise stated.

remaining sentences were either stayed pursuant to section 654 or ordered to be served concurrently. Defendant was also ordered to pay a $300 restitution fine, and the court stayed a $300 parole revocation fine. Defendant appeals from an order after judgment. Based on our independent review of the record, we find no error and affirm the judgment.

## II.

## FACTUAL BACKGROUND

The victim S.B. and defendant met while in high school. They became romantically involved in 2015 and have three young children (ages one, three, & five) together. They lived together on and off. S.B. has two older children (ages 13 & 15). Defendant and S.B. broke up in 2021 and continued to coparent their children. According to S.B., once they broke up, defendant's behavior changed, and he started claiming he was God and "talking crazy." In January 2022, defendant visited S.B. S.B. noted that defendant spent a lot of time in the garage while he visited. She found methamphetamine pipes in the garage.

On January 5, 2022, S.B. filed a temporary restraining order against defendant, which was granted, due to defendant's drug use and threats to kill S.B. and her two older children. The following day, January 6, defendant showed up at S.B.'s detached garage because he wanted to get back his blue toolbox that was taken by the friend who had served the restraining order. S.B. allowed defendant to stay in the garage while he waited for the friend to arrive with the toolbox. While in the garage, S.B. spoke to defendant and accused him of stealing her check. She also spit on him. In response, defendant was

3

calm and smiling "weird."  S.B. then left to check on the baby.  She returned to the garage to get her son's phone, which defendant had been using to call someone to come pick him up.  When she returned to the garage, S.B. and defendant discussed the children.  S.B. told defendant that he needed help with his drug use if he wanted to continue seeing his children.  While they were talking, S.B.'s 13-year-old son came to the garage door, and defendant said, "'Your mom's fine, I'm not gonna hurt your mom.'"

S.B. again left the garage and returned a third time.  When she tried to leave, defendant stood in the way, shoved her, and she fell.  While calm and smiling, defendant pulled out a three-inch pocketknife, and S.B. laughed and asked, "you gonna stab me."  Defendant then stabbed S.B. twice in the neck and nine to 10 times on her body.  As defendant was stabbing S.B., he was smiling and holding her down.  During the incident, defendant told S.B. that he was going to kill her and "everyone inside of the residence."  S.B. believed defendant was capable of killing everyone, and S.B. feared for her and her family's safety.  Defendant stopped stabbing S.B. when S.B.'s son kicked open the garage door, and her older daughter screamed.  Defendant then ran away.

S.B.'s son dragged S.B. out of the garage and put a towel on her bleeding neck.  S.B.'s son called 911, and S.B. went to get help from the neighbor, who drove S.B. to the hospital.  In the car on the way to the hospital, S.B. stated that she wanted to live for her kids, and "he just stabbed me, oh, my God, he just stabbed me."

S.B. had nine stab wounds and received stitches on her neck, ribs, breast, and arms.  There was lots of blood in the garage and a trail leading out of the garage.  Prior to

4

the January 6, 2022, incident, law enforcement had responded to S.B.'s residence nine times to "calls for service." There were four calls for service on January 4, four calls on January 5, and one on January 6.

Defendant testified on his behalf. He claimed that on January 6, 2021, he had taken street prescription narcotics and methamphetamine, and the drugs affected how he acted. He stated that another adult roommate and S.B.'s parents, along with her five children, were at the house on January 6, and that he seldom went inside the house and hung out in the garage. He did not know about the restraining order when he was at the house on January 6, but learned about it from a neighbor while he was there.

Defendant explained that he and S.B. got into a fight about defendant taking their children to the park and not returning until the evening. People were coming and going from the garage, yelling at defendant. At one point, they were yelling at him through the kitchen window, and at that time, S.B. had a kitchen knife in her hand, and her mother had a broomstick. S.B., S.B.'s mother, and the roommate forced their way into the garage, breaking the lock, at which time defendant had barricaded himself in the garage with a box cutter knife he got from a toolbox in the garage to defend himself. Defendant was in fear for his safety. S.B.'s mother hit him with a broomstick.

Eventually, it was just S.B. and defendant in the garage, and that is when the stabbing happened. S.B. was angry, yelling, spitting on defendant, and pushing him. Defendant believed that S.B. "was trying to provoke" him. The two wrestled over the blade of the knife S.B. was holding and both got stabbed. Defendant got stabbed in his

5

hand, behind his ear, and shoulder. S.B. used the knife against defendant, and he used a knife to protect himself. Defendant asserted that S.B. was injured by the knife she was holding in her hand. The altercation ended when defendant got the knife from S.B. He claimed that he never saw S.B.'s son, that he had blacked out for part of the time, and that he was scared for his safety. Defendant testified that he had no intention to hurt or kill anyone and that he did not stab S.B. intending to kill her. He left once S.B.'s parents told him to leave.

III.

DISCUSSION

After defendant appealed, upon his request, this court appointed counsel to represent him. Upon examination of the record, counsel has filed a brief under the authority of *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*) and *Anders v. California* (1967) 386 U.S. 738 (*Anders*), setting forth a statement of the case, a summary of the facts and potential arguable issues, and requesting this court to conduct an independent review of the record. Counsel identifies the possible issues as (1) whether there was substantial evidence to prove defendant acted with the intent to kill as required for attempted voluntary manslaughter; and (2) whether the trial court prejudicially erred in sentencing defendant to the upper term.

We offered defendant an opportunity to file a personal supplemental brief, but he has not done so.

6

An appellate court conducts a review of the entire record to determine whether the record reveals any issues which, if resolved favorably to defendant, would result in reversal or modification of the judgment. (*Wende*, *supra*, 25 Cal.3d at pp. 441-442; *People v. Feggans* (1967) 67 Cal.2d 444, 447-448; *Anders*, *supra*, 386 U.S. at p. 744; see *People v. Johnson* (1981) 123 Cal.App.3d 106, 109-112.)

Pursuant to the mandate of *People v. Kelly* (2006) 40 Cal.4th 106, we have independently reviewed the entire record for potential error and find no arguable error that would result in a disposition more favorable to defendant.

IV.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

J.

We concur:

MILLER

Acting P. J.

FIELDS

J.

7